THE JOHN SPRY LUMBER COMPANY v. THE STEAM-BARGE C. H. GREEN ET AL.

*Tort—Jurisdiction—Admiralty—Real estate—Appurtenances tc saw-mill—Negligence of master of vessel.*

1. *Locality* is the *test* in cases of *tort* by which to determine whether the wrongful act is one of admiralty cognizance.
2. The circuit court has jurisdiction under chapter 285, How. Stat., of a suit to recover damages sustained by the owner of a saw-mill by the collision of a vessel with a boom in which logs were stored for manufacture in said mill, which was fastened to piles in the mill-dock, which were torn out, and the boom and logs thereby released, the same being an injury to *real* estate, from which the loss of the logs was the direct result.
3. The definition of the term " torts," when used in reference to admiralty jurisdiction, is not confined to wrongs or injuries committed by *direct* force, but includes, also, wrongs suffered in consequence of the negligence or malfeasance of others, wh re the remedy at common law is by an action on the case. *Railroad Co. v. Tow-boat Co.*, 23 How. 209.
4. In applying the test of jurisdiction, namely, the *locality* of the *tort*, we must ascertain the locality of the *thing* injured, and not of the offending *instrument* by which the injury was done.
5. A general grant of a saw-mill passes to the grantee the dock and booms used in its operation, under the ancient and well-recognized rule that, where the grant is a general one, whatever belongs to the thing granted, as a constituent part or element, passes thereby.
6. A boom consists not only of the timbers by which the commodity boomed is inclosed, but also of the piers, piles, or other thing by which it is held in place.
7. Piles in a mill-dock, to which booms for the storage of logs are attached, are real estate, and a willful injury to them constitutes a trespass to real property.

8. All that the law requires of a master of a vessel is the exercise of *ordinary* care and skill under the circumstances surrounding him, and the burden of proof of showing a failure to exercise *such* care and skill is upon the party alleging it.

9. Upon the facts of this case, the master is held *not* to have exercised the *ordinary* care and skill required of him, and the judgment is affirmed, with costs.

Appeal from Chippewa. (Steere, J.) Argued June 4 and 5, 1889. Decided October 11, 1889.

Proceedings under chapter 285, How. Stat., to collect damages for a tort alleged to have been committed by respondents. Respondents appeal. Affirmed. The facts, and points of counsel *passed* upon by the Court, are stated in the opinion.

*J. H. Goff* (*Shepard & Lyon* and *C. E. Kremer,* of counsel), for complainant.

*Tarsney & Weadock* (*F. H. Canfield,* of counsel), for respondents.

CHAMPLIN, J. This proceeding was commenced in the court below under chapter 285 of Howell's Statutes, entitled "Collection of Demands against Water-craft," to enforce a lien claimed to be created by the statute against the steam-barge C. H. Green for damages for a tort alleged to have been committed by the steam-barge in running into and breaking a boom of pine logs belonging to complainant, which boom was at the time in St. Mary's river, causing damage to the John Spry Lumber Company to the amount of $15,000, which damages, it was alleged, were occasioned solely by the negligence, misconduct, unskillfulness, and carelessness of the master and persons navigating said steam-barge C. H. Green, and not by or through the fault, negligence, or misconduct on the part of said John Spry Lumber Company, its agents or employés.

76 MICH.—21.

Upon the complaint a warrant was issued against the steam-barge, as provided by section 4 of the act, by virtue of which the sheriff was commanded to seize the steam-barge, her tackle, apparel, etc., to—

"Answer any and all liens there shall be established against it, according to law, and to detain the same in custody until the further order of the court."

Under this warrant the vessel was seized and held until, having been bonded under sections 14 and 15, she was released under a writ of restitution pursuant to section 17. There was also a summons issued under section 10 of the act, which was served upon the master of the vessel.

Answer was filed, denying the jurisdiction of the court. It also denied any collision with a boom, as alleged; averred that if any collision occurred it was with a raft of saw-logs which the complainant left negligently and carelessly afloat in the navigable waters of the river, in an exposed condition, and was not within any boom belonging to said complainant, and was not within the lines of any dock owned by complainant; but, on the contrary, said raft of logs with which said steam-barge came in contact, if any collision occurred, was afloat and adrift a great distance, to wit, 100 feet, from the dock of the complainant, out in the navigable waters of St. Mary's river, and that, had said raft of logs or timber been near to, or within the boom limits of, complainant's said dock, no damage of any kind would have been caused either to said logs or timber of said complainant.

At the trial in the court below, after the testimony was closed, respondents moved to dismiss the complaint and proceedings thereunder for want of jurisdiction. This motion was denied, and a decree was rendered in favor of the complainant for $3,500, with costs, from which decree respondents appealed.

Since the cause came into this Court both sides have taken

additional testimony.[1] It appears from the testimony that on October 3, 1887, the propeller C. H. Green, laden with 1,165 tons of iron ore, a vessel of the United States, enrolled and licensed for the coasting trade, and engaged in the business of commerce and navigation between ports of different states, being properly officered and manned, and being in all respects seaworthy and fit for the voyage which she had undertaken, was bound from Marquette, Michigan, to Ashtabula, Ohio. She is a vessel of 724 tons. Her draft was from 15 to 15½ feet. She had in tow the schooners or barges Rosa Sonsmith, drawing 14 feet, 8 inches, and the Mattie Bell, drawing 14 feet, 10 inches, attached by lines astern, in the usual manner. The cargo of each schooner was about 1,300 tons of iron ore. The entire length of the tow was about 1,560 feet.

She reached the ship canal at the Sault Ste. Marie about two o'clock in the morning of October 3. The canal was crowded with vessels. A severe storm commenced early in the day, and continued until night. The wind was from the north-west, and at the United States signal station it registered a velocity of from 40 to 59 miles an hour. In the river below the lock the wind was described as a stiff breeze, but not of the velocity indicated by the signal service. By reason of the difficulty in navigating the St. Mary's river below the locks, it was not usual to proceed down the river at night, and vessels bound down usually laid up until morning.

The Green and her tow were locked through the canal about 6 o'clock P. M., and passed down the river opposite the John Spry Lumber Company's dock, and rounded to; and, after her tow had come about, and was strengthened and headed up stream, the head barge or schooner Sonsmith dropped her anchor, the Green intending to drop alongside

---

[1] Act No. 151, Laws of 1887, gives the Supreme Court power, at any time, to call upon the parties to any suit in law or equity, or any witnesses thereto, to testify orally in open court, etc.

and make fast to her, as is usually done under such circum-
stances, the stern schooner still holding onto her line with
the Sonsmith.

The place where the anchor was dropped was about 600
feet from, and nearly opposite to, the dock of the John Spry
Lumber Company. This dock is 749 feet in length, and
extends into the water of the river about 450 feet from the
shore line, and from 1,000 to 1,500 feet from the steam-boat
channel in the middle of the river. The dock was con-
structed of wooden piles, which were driven into the bed of
the river in rows, forming the water-front of the wharf.
Upon these rows of piles rested timbers, which formed a cap
for the piles, and this cap was bolted into the head of the
piles by iron drift-bolts, so that the front row of the piles
was connected with the second row, driven several feet back
or inside of the outer row. Upon the caps running from the
front to the back row of piles was placed a long timber,
which extended along the face of the front of the dock, rest-
ing upon the caps. This was bolted with iron bolts to the
caps over the piles, so that the outer row of the piles was
held in place and in an upright position by the cap and
stringer. The cap timber prevented the piles from being
shoved inward or pulled outward, and the top timber stayed
them, and prevented them from being moved from one side
to the other.

Along the face of the dock, and fastened to the front row,
and near the edge of the water, was a stringer or guard-rail.
This was formed of round pieces of timber, from 8 to 12
inches in diameter, and firmly drift-bolted into each pile, and
projecting out beyond the face of the dock.

The booming grounds of complainant were between the
dock and the shore, and extended east several hundred feet,
and were formed by several clumps of piles, six or seven in
number, being driven at intervals on a line with the outer
line of the dock, and from the eastern extremity to the shore.

This portion of the boom is called the "store-boom," and that portion between the dock and the shore is called the "mill-boom," from which the logs are supplied to the company's saw-mill upon the shore. The boom timbers which inclosed the store-boom were not permanently fastened to the piles, but were so arranged that they could be removed at pleasure.

At the lower or eastern end of the store-boom a clump of piles were driven about fifty feet from the shore, and a boom-stick was fastened to these piles, extending to the shore. The logs were brought to the store-boom in what are called sack or bag rafts. These rafts are balloon-shaped, and are formed by inclosing loose logs with boom-sticks, and in that shape are transported by being towed by tugs to the desired place.

The accident occurred on Monday, the third day of October. On the Saturday preceding, a sack raft containing about one and one-half million feet of saw-logs was brought up from the booming grounds below the store-boom, a distance of about one-third of a mile, and made fast to the second clump of piles of the store-boom below or east of the dock, and was permitted to remain moored to these piles until Monday morning. At this time there were no boom-sticks connecting or fastened to the several clumps of piles of the store-boom, except the one before mentioned from the shore to the first clump at the foot of the store-boom. The sack raft lay outside of the line of piles of the store-boom, and extended a considerable distance below it.

On Monday morning Capt. Long of the tug Lark went to the lower end of the raft, and pushed it around towards the shore, and made the boom-stick inclosing it fast to the clump of piles nearest the shore. He then cut the inner boom-sticks on the raft next to the lower end of the boom, so as to permit the logs to escape and float into the store-boom. He then made fast his tug to the upper end of the raft, let loose from the piles where it was moored, and drew the outer

boom-sticks which inclosed the logs up the river, thus forcing the logs into the store-boom. He made the boom-sticks fast to a pile in the front side of the dock at about four o'clock in the afternoon. The fastening of the boom to this pile was not intended to be permanent, but as the logs were passed into the mill-boom and sawed, and room thus made at the upper end of the boom, this upper end of this boom-stick would be towed further up and made fast again, thus forcing more logs into the store-boom and retaining them there.

The condition' of the boom at the time of the collision was as follows: The upper end of the boom timber was fastened by a chain to piles in the dock, and the boom timbers thence extended down the river outside of the piles driven to make the store-boom, and extending further out into the river as the line proceeded east, and passing around the east end a distance of some 30 feet from the piles driven for the store-boom.

The C. H. Green, after her tow had anchored, started towards the dock with her tow-line still fast to the Sonsmith. The wind was blowing down the river, and she struck the boom-stick, where it was about 20 feet from the dock, with such force that one of the piles to which it was fastened was torn out entirely, and another was pulled over so that the chain slipped off, thus releasing the boom-sticks, which floated down the river, and permitted the logs to escape. The structure formed by the boom timbers, it will be seen, did not, at the time of the collision, form a raft, but had been changed into a boom, in which the logs were held for storage.

The first question to be determined is whether, under the facts above stated, this was a maritime tort, over which the federal courts alone have jurisdiction. Locality, by all the authorities, is the test in cases of tort by which to determine whether the wrongful act is one of admiralty cognizance. *The Commerce*, 1 Black, 579; *Leathers v. Blessing*, 105 U.

S. 626; *The Plymouth,* 3 Wall. 36; *Railroad Co. v. Tow-boat Co.,* 23 How. 209; *Rock Island Bridge,* 6 Wall. 213.

It was said in the case of *The Commerce,* 1 Black, 580:

" Whether a wrongful act, committed upon the person or property of another, was of a character to be denominated a marine tort, and consequently to be regarded as the proper foundation of a suit cognizable in the admiralty, undoubtedly depends upon the locality where the wrongful act was committed, as already explained. But marine torts are in the nature of trespasses upon the person or upon personal property, and they may be prosecuted *in personam* in any district where the offending party resides, or *in rem* wherever the offending thing is found to be within the jurisdiction of the court."

And the case of *Railroad Co. v. Tow-boat Co.,* 23 How. 209, is authority, holding that the definition of the term "torts," when used in reference to admiralty jurisdiction, is not confined to wrongs or injuries committed by direct force, but that it includes, also, wrongs suffered in consequence of the negligence or malfeasance of others, where the remedy at common law is by an action on the case.

The contention of the complainant in this Court is that the trespass committed was upon its real estate, and consisted in breaking its dock, and pulling out the piles that supported it, thus causing the chain which held the boom to become loosed, and that the loss of the logs was the direct result of this injury to its real estate.

Counsel for complainant cite and rely upon the case of *Johnson v. Elevator Co.,* 119 U. S. 388 (7 Sup. Ct. Rep. 254), as decisive of the point taken against the jurisdiction of the court. That case arose under a statute of the state of Illinois quite similar to our own, for an injury done to an elevator by a vessel in navigating the Chicago river. The jib-boom of the vessel penetrated the wall of the elevator, whereby a large quantity of corn stored therein ran out and was lost in the river. The position was taken that the federal court in admiralty alone had jurisdiction of a tort of

that kind. Mr. Justice Blatchford, speaking for the Court, said :

"Under the decisions of this Court in *The Plymouth,* 3 Wall. 20, and in *Ex parte Insurance Co.,* 118 U. S. 610 (7 Sup. Ct. Rep. 25), at the present term, it must be held that the cause of action in this case was not a maritime tort of which a district court of the United States, as a court of admiralty, would have jurisdiction; and that the remedy belonged wholly to a court of common law, the substance and consummation of the wrong having taken place on land, and not on navigable water, and the cause of action not having been complete on such water. This being so, no reason exists why the remedy for the wrong should not be pursued in the state court, according to the statutory method prescribed by the law of the state, even though that law gives a lien on the vessel. The cases in which state statutes have been held void by this Court, to the extent in which they authorized suits *in rem* against vessels, because they gave to the state courts admiralty jurisdiction, were only cases where the causes of action were cognizable in the admiralty. Necessarily no other cases could be embraced. *The Moses Taylor,* 4 Wall. 411; *The Hine v. Trevor,* Id. 555; *The Belfast,* 7 Wall. 624."

After reviewing the petition, and showing that the proceedings were really *in personam,* he says :

"There being no lien on the tug, by the maritime law, for the injury on land inflicted in this case, the state could create such a lien therefor as it deemed expedient, and could enact reasonable rules for its enforcement, not amounting to a regulation of commerce."

Our statute provides that upon filing the complaint the clerk of the court shall issue a warrant to the sheriff of the county under the seal of the court, returnable not less than 14 nor more than 30 days from its date, containing a brief statement of the claim filed, commanding him to seize and safely keep such water-craft, her tackle, apparel, and furniture, to answer all such liens as shall be established against it according to law, and to make return of his proceedings under such warrant within 10 days after seizure; and the

clerk is also required to issue a summons to the owner or master of such craft, containing a similar statement, and returnable, as aforesaid, at the same time as the warrant, which said warrant and summons shall be served at least 14 days before the return-day thereof.

The statute also provides for notice, and for intervening creditors, and also for the bonding of the vessel by the master or any person interested at any time before judgment or decree of sale; and in case the bond is executed, a writ of restitution is to be issued, and the vessel is thenceforth discharged from all liens. If judgment or decree passes for complainant after the vessel is discharged, it is to be entered against the principal and sureties in the bond, but in no case shall the judgment exceed the penalty of the bond; and it is provided—

"That the subsequent proceedings shall be the same as now provided by law in personal actions in the circuit courts."

In all these respects our statute is substantially the same as that of the state of Illinois. The vessel having been bonded, the lien is discharged, and the proceedings are *in personam.*

The case at bar is not an exact parallel with that of *Johnson v. Elevator Co.* The trespass in the latter case was beyond question an injury to real estate. Here the injury complained of was to the boom, and the question is presented whether the boom was real estate at the time of the injury. The point involved is one of considerable doubt. In solving it we must look to the surrounding circumstances, the situation, and use to which the real estate was applied. The complainant was the owner of a saw-mill, with all the necessary outfit and appurtenances for the manufacture of saw-logs into lumber.

The testimony shows that the logs which were to be manufactured at the mill were put into the booms, as above

described, and it is clear to any person that the operations of
the mill could not be carried on without the use of these
booms in which to store and hold the logs.   The dock upon
which the lumber was piled, and from which it was shipped
to market, was also necessary to the operation of the saw-mill.
Had the John Spry Lumber Company made a general grant
of this saw-mill, the dock and booms used in the operation of
the mill would have passed to the grantee, under the ancient
and well-recognized rule that, where the grant is a general
one, whatever belongs to the thing granted, as a constituent
part or element, passes thereby.   1 Shep. Touch. 96.

And in *Farrar v. Stackpole*, 6 Me. 154, it was held that
the grant of a saw-mill with privileges and appurtenances
passes the machinery used in it, and would include a mill-
chain, dogs, and bars, therein, by which the logs are drawn
therein and secured for sawing;  and  generally whatever
things are fitted and prepared to be used with  real estate,
and have been applied thereto, pass with the realty to which
they have thus become accessory.   So in the case of *The
City of Erie v. Canfield*, 27 Mich. 479, where the brig collided
with a boom located in the navigable waters of the Manistee
river, whereby the boom was broken, and the saw logs therein
were released, scattered, and damaged and lost, the question
of jurisdiction was raised in a proceeding under this act.
This Court held that the tort consisted in an injury to a
structure which pertained to the adjacent land just as much
as a wharf or a building erected thereon would have done,
and a wrongful injury to it would not be a marine injury, and
could not be redressed in a court of admiralty.

In *People's Ice Co. v. The Excelsior*, 43 Mich. 336 (5 N.
W. Rep. 398), which was a proceeding under this law, the
injury complained of was the destruction of the ice formed
on the premises of complainant within its boom at Belle
Isle.   No injury was done to the boom, but the damage was
done by running the vessel rapidly up and down the Detroit

river close to the boom, so that the swell thereby created broke up the ice field. Here the subject injured was floating upon the water, and the Court held that the complaint set up a cause of damage very clearly within the statute.

In applying the test of jurisdiction, namely, the locality of the tort, we must ascertain the locality of the thing injured, and not of the offending instrument by which the injury is done.

The facts of this case locate the thing injured as a boom inclosing about one and one-half million feet of saw-logs, attached at both ends to the realty, and, in itself, considering its nature and use at the time of the injury, a part of the real estate to which it was attached. A boom consists not only of the timbers by which the commodity boomed is inclosed, but also of the piers, piles, or other thing by which it is held in place. The piles to which the boom-stick was secured at the eastern extremity were a part of the boom, as also were the piles in the dock to which the other extremity of the boom-stick was fastened. It cannot be questioned that these piles were real estate, and that the injury to them, if wrongfully done, would constitute a trespass upon real property. The proof is conclusive that the part of the boom consisting of the piles to which the chain was attached was wrenched from its position, one pile pulled entirely out, and the other over, and in consequence the boom became broken and the logs escaped, being carried down the river by the force of the current.

Under the facts of this case, and the decisions above referred to, we must hold that the circuit court had jurisdiction.

The next question to be determined is whether the damages arising from the injuries done occurred through the negligence or misconduct of the master of the vessel. Upon this question the testimony is conflicting, and additional testimony has been taken since the case was decided in the court below. The John Spry Lumber Company's dock was

not a public dock, although vessels frequently stopped there for passengers and freight. The dock, however, was mainly used for shipping lumber manufactured at the saw-mill, and was frequently used to moor rafts of logs to, which were to be sawed at the mill. There was plenty of navigable water in front of the dock, and between it and the Canada side of the river, and the boom, as it existed at the time of the collision, was not an impediment to the navigation of the river, and extended no further out into the river than was reasonable under the circumstances, and must be held to have been rightfully there.

It is claimed by the owners of the C. H. Green that, after the leading tow, which was the Sonsmith, had rounded to and dropped her anchor, the C. H. Green endeavored to drop down alongside the Sonsmith and make fast to her for the night. In doing so, the tow-line was not cast off from either vessel, and the owners claim that on account of the force of the wind and the current the C. H. Green was unable to accomplish her object; that the wind and current were on her starboard bow, and, both being too strong for her to overcome, the head of the propeller was by reason thereof swung to the port or towards the dock, in such manner as to make it necessary for her to start ahead; that this was done with her wheel hard aport; that after straightening up as much as possible she again attempted to back down alongside the Sonsmith, but the wind and current, still being on her starboard bow, were so strong that she sagged against the raft which lay alongside the dock, and that it was impossible for her to avoid coming in contact with the raft; that the angle at which she headed towards the dock was about 45 degrees.

All that the law requires of the master is the exercise of ordinary care and ordinary skill under the circumstances, and the burden of proof of showing the failure to exercise ordinary care and skill is upon the party alleging it. The pre-

ponderance of the evidence shows that it was not yet dark
when the C. H. Green approached the dock; that both the
dock and boom of logs could be plainly seen from the pro-
peller.

The particular negligence and failure to exercise ordinary
skill, as shown by the testimony and relied upon by com-
plainant, is in bringing his tow around too near to the dock
of complainant, being within three lengths of the propeller
from the dock; that the master had determined before leav-
ing the canal lock to round to, and fasten to the Sonsmith for
the night, and, having determined upon this, and knowing
the unusual force of the wind and of the current, he should
have kept more to the Canadian shore, in order to have
plenty of sea-room to bring the tows around, and permit the
propeller to back down in safety; that he might, under the
circumstances, expect to encounter difficulty from the unusual
force of the wind, and should have acted accordingly, but,.
instead of exercising due caution in this regard, he brought.
his tow to anchor within 600 feet of complainant's dock, and
experienced the difficulty which he ought to have anticipated.

But the greatest negligence shown by the testimony con-
sisted of this: After he found himself in the situation
described by himself, with his wheel hard aport, and the
power of his rudder overcome by the wind and current upon
his starboard bow, swinging the propeller down the river, he
still held onto the tow-line, which was 400 feet long, and
nearly three inches in diameter, which slacked into the
water, and operated as an efficient aid to the wind and cur-
rent in overcoming the effect of the propeller's rudder.    The
Sonsmith being anchored abreast of the lower part of the
dock, the propeller, when she backed down, was opposite, or
nearly so, the upper end of the boom, and as she swung, and
was carried down somewhat by the current and wind, must
have approached the dock at nearly right angles.

It could not well be otherwise than that, as the propeller backed down opposite the Sonsmith, this 400 feet of tow-line, resting, in a great measure, upon the bottom of the river, would operate to hold the stern of the propeller up against the wind and current, and prevent her from being maneuvered so as to bring her stern into the wind with the same facility as she could have been had the tow-line been cut off. No considerations of convenience in starting in the morning should have been permitted to influence the master of the propeller to hold on to the tow-line under the circumstances in which he was placed. We think he did not exercise that ordinary care and skill which was required of him by the circumstances in which he was placed.

Upon the question of damages we see no reason from the testimony to disturb the judgment of the court below, and the judgment will be affirmed, with costs.

The other Justices concurred.