GORDON *v.* DRAKE.

1. APPEAL AND ERROR—NEW TRIAL—SAVING QUESTIONS FOR REVIEW.
   Where the trial court denied the motion for a new trial
   without filing his reasons therefor, and no request was
   made to give them, his action in denying the motion can-
   not be reviewed in this court.

2. ADMIRALTY—JURISDICTION—LOCALITY—TORTS.
   In cases of tort, the test by which to determine whether the
   wrongful act is one of admiralty cognizance, is locality.

3. SAME.
   Where the tort originates upon the water, but is consum-
   mated upon the land, it is not within the admiralty juris-
   diction.

4. SAME—CIRCUIT COURTS.
   So, where plaintiff was injured by being crushed between
   the pier and a launch on which he was a passenger, while
   jumping ashore at the command of the master of the boat,
   the circuit court, and not the Federal court, had juris-
   diction of the action for damages against the owners of
   the launch.

5. MASTER AND SERVANT—NEGLIGENCE—TRIAL—QUESTION FOR JURY.
   Where the question before the court was whether the act
   complained of was an act of negligence of the master of
   the launch for which defendants were liable, or was an
   error of judgment in a case of emergency, it was proper
   to submit it to the jury for determination. KUHN, OSTRAN-
   DER, and BROOKE, JJ., dissenting.

6. SAME—NEGLIGENCE—INCOMPETENT SERVANT—PERSONAL INJURIES
   —NOTICE—TRIAL.
   Where there was no evidence that the master had knowl-
   edge or notice of the servant's claimed incompetency, or
   anything that was sufficient to put him upon inquiry, the
   court did not err in taking that question from the jury.

Error to Berrien; Bridgman, J.  Submitted June 8,
1916.  (Docket No. 6.)  Decided September 26, 1916.

Case by Harry Gordon against Logan J. Drake and another for personal injuries. Judgment for plaintiff. Defendants bring error. Affirmed.

*O'Hara & O'Hara,* for appellants.

*Cady & Andrews,* for appellee.

STONE, C. J.   This is an action on the case brought to recover damages for an injury sustained by the plaintiff by reason of the alleged negligence of the employee of the defendants.   At the time of the injury complained of the defendants were the owners of a gasoline launch known as the Wolverine, with which they were engaged in the transportation of passengers between the dock in St. Joseph and Pottawattamie Park on Lake Michigan, north of St. Joseph about eight miles.   The boat was about 46 feet in length, with a beam of 9½ feet.   One man operated the boat. The boat on this occasion was in charge of one Porter as master, who was duly licensed.   On July 14, 1913, at about 6 o'clock p. m., plaintiff paid the fare and took passage in this boat to be carried to the harbor at St. Joseph.   Ordinarily it took 50 minutes to an hour to make this run.   The plaintiff was the only passenger on this trip, and there were but the two persons named in the boat.   When the boat left Pottawattamie Park the sun was shining, and there was nothing to indicate a storm.   A storm, called by the witnesses a "squall," struck the boat when it was about five miles from Pottawattamie Park, and about three miles from St. Joseph Harbor.   The master, in his testimony, described the storm as follows:

"It was wind and rain, and the rain was so heavy you couldn't see anything, you couldn't see 20 feet from you, and it would take—the wind was so strong it would take the water, what little sea there was, and blow it right into the boat.   *   *   *

"*Q.* How sudden did that come upon you in time, from the time you first noticed a disturbance in the atmosphere until the storm had reached you?

"*A.* Not over ten minutes."

He described the wind as a northwest wind, and that he was going a little west of south, as the outer end of the pier at St. Joseph was about 2,000 feet from the shore. About three-quarters of an hour after leaving Pottawattamie Park, the master discovered that he was abreast·of the Edgewater Clubhouse pier, which was about 2,000 feet north of the St. Joseph pier, and he tried to get out into the lake from the pier. The pier at the Edgewater Clubhouse extended out into the water some 400 feet. The master claimed, in his testimony, that when he discovered he was 40 or 50 feet from the Edgewater Clubhouse pier he tried to turn to go out into the lake and away from the pier, but that the engine began to fail him, and that he could not steer the boat, and that finally the engine stopped, and the wind blew the boat against the Edgewater Clubhouse pier. There was at the trial a sharp conflict in the evidence as to whether the master shut off the power when near the Edgewater Clubhouse pier, or whether the engine failed to operate at that point. It was testified to by the plaintiff that the master shut off the power as the boat came up to the pier. His testimony upon that point was as follows:

"*Q.* When he discovered the light what did he do?

"*A.* He pulled in quite a way, and he had to come around to make the turn in order to come out past the edge of the pier. It seems he miscalculated the steering gear, and he struck the end of the pier, which tore off part of the canopy.

"*Q.* What occurred then?

"*A.* As soon as he struck it, he shut off his engine, threw up the trapdoor, little door on top, and got up on the pier, and he said 'Jump!'

"*Q.* Where was he when he told you to jump?

"*A.* He was on top, one foot on the pier and one foot on the canopy.

"*Q.* Was the engine going up to that time?

"*A.* Until the time he—just before, up until the time he struck the pier, he shut his engine off.

"*Q.* Did you attempt to make a landing then at his command.

"*A.* When he told me to jump, I jumped for the pier. I had to jump up, and I grabbed a post on the pier—I believe it was a post or board; I don't remember which now.

"*Q.* What occurred then?

"*A.* I hung on. The waves kept dashing the canopy of the boat up against the pier, and I was in between the two; I was used as a pad, and he tried to help me up. And I hung on, and finally I told him: 'You can't do any good there; get on the other side of the fence (I believe they have a railing there) ; that way you may be able to help me, but you cannot do any good there.' And he got on the other side and got hold of my arm. I managed to get one leg on the floor of the platform, and when I got up there, this side of the fence, he started on down to the clubhouse. I got across the fence and started after him.

"*Q.* Did he take any tow line ashore with him?

"*A.* No, sir.

"*Q.* Did he make any effort to fasten the boat to the pier?

"*A.* No, sir.

"*Q.* What did he do with the boat?

"*A.* He just left the boat at the mercy of the gale."

The negligence claimed in the declaration was that the defendants put in charge of said boat an inefficient, incompetent, and inexperienced pilot. And, further, that the said pilot or master conducted himself so carelessly, negligently, and unskillfully in the control and management of said boat that by and through his carelessness and negligence in managing and operating the sail boat, and for want of due care, he misdirected and misguided said boat, so that it collided with and against the pier in front of the Edgewater Clubhouse,

and that said pilot became frightened, and then and there negligently jumped to the pier and abandoned the boat and the plaintiff therein, and ordered the plaintiff to jump therefrom to the said pier. And it was the claim that, while the plaintiff was acting in obedience to the orders and command of the said pilot the said plaintiff was violently thrown against said pier with great force, and crushed between the said boat and pier by means whereof the plaintiff was greatly hurt, injured, bruised, and wounded. There was evidence tending to support these allegations.

The trial court, in submitting the case to the jury, took from their consideration the question of the incompetency of the master or pilot. Upon that subject he charged the jury as follows:

"And I instruct you, as requested, that there is no evidence in this case that will warrant you in finding defendants negligent, simply because they employed Porter to operate this boat. It is possible, however, for a competent man to be guilty of negligence, but negligence is never presumed, but always must be proved. Having placed Mr. Porter in charge of the launch the defendants would be responsible for negligence, if any, on his part. Negligence is the failure to do what a person of ordinary care and prudence would have done under the circumstances and the situation, or doing what such person under the existing circumstances would have done. The duty is indicated and measured by the exigencies of the occasion. The master of the launch need not be of the highest skill and attainments in his profession, and need possess only the ordinary and usual requirements of those in like position; and, because any results might show that some other course would have been preferable, there would be no liability for negligence, though he had made a mistake, if at the time, under the circumstances, he acted with such ordinary care and prudence as is usually exercised by persons in like position. Ordinary care depends upon the circumstances of each particular case, and such care as a person of

ordinary prudence and skill would usually exercise under the same or similar circumstances."

The plaintiff recovered a verdict and judgment of $500.

There was a motion for a new trial, which was denied, but no reasons were filed in writing by the circuit judge in denying the motion, and there is nothing in the record to indicate that he was requested to give his reasons. We cannot therefore review his action upon the motion for a new trial. *Griffin* v. *McKnight,* 116 Mich. 468 (74 N. W. 650) ; *McRae* v. *Lumber Co.,* 102 Mich. 488 (60 N. W. 967).

The defendants have brought the case here, alleging error.

It is the contention of defendants' counsel:

(1) That if the plaintiff ever had a cause of action against the defendants, it should have been litigated in the courts of admiralty. This question was raised by defendants in their motion to direct a verdict on the conclusion of the testimony.

(2) It is the claim of the defendants that there was no evidence of negligence on the part of the defendants or their employee Porter. This question was also raised by motion to direct a verdict, and by requests to charge, which were refused.

1. The first question to be determined is whether, under the facts above stated, this was a maritime tort over which the Federal courts alone have jurisdiction. Locality, by all the authorities, is the test in cases of tort by which to determine whether the wrongful act is one of admiralty cognizance. Where the active cause of the injury originates upon navigable waters, and the tort is consummated upon land, admiralty has no jurisdiction. 1 Cyc. p. 843, and cases cited. Personal injuries received on shore, although caused by negligence originating on a ship, are not within the jurisdiction of admiralty. *Price* v. *Belle of the Coast*

(D. C.), 66 Fed. 62; *The Mary Garrett* (D. C.), 63 Fed. 1009; *The H. S. Pickands* (D. C), 42 Fed. 239; *The Mary Stewart* (D. C.), 10 Fed. 137; *Billings* v. *Breinig*, 45 Mich. 65 (7 N. W. 722).

"The test of jurisdiction in tort is the locality, not the nature of the act. The tort complained of must have occurred on water to be within the admiralty jurisdiction, so where it arises upon the water, but is consummated upon the land, it is not within the admiralty jurisdiction." 1 Am. & Eng. Enc. Law (2d Ed.), p. 656, and cases cited in note.

In *The Mary Stewart, supra,* it was held that an injury done to a person while standing on the wharf, by a bail of cotton which fell upon him from a ship's tackle alongside, cannot be redressed in admiralty. In *The H. S. Pickands, supra,* the libelant, who was engaged in repairing a vessel which lay at a wharf, attempted to descend a ladder connecting the wharf with the bulwark of the vessel. The ladder had been protected against slipping by a cleat at the bottom, but had been removed from the protection of the cleat by the negligent act of the master. In descending the ladder, it slipped, and libelant was thrown upon the wharf and injured. It was held that a court of admiralty had no jurisdiction. Brown, J., said:

"I am clear in my opinion that a court of admiralty has no jurisdiction in this case. It has never been doubted since the case of *The Plymouth*, 3 Wall. 20, that, to enable us to take cognizance of a maritime tort, the injury must have been consummated, and the damage received, upon the water. The mere fact that the wrongful act was done upon a ship is insufficient. Subsequent adjudications have in no wise tended to limit or qualify this rule."

See, also, *The City of Erie* v. *Canfield*, 27 Mich. 479; *The John Spry Lumber Co.* v. *The C. H. Green*, 76 Mich. 320 (43 N. W. 576).

The trend of the authorities seems to be to the effect

that if the injury complained of happened on land, it is not cognizable in admiralty, even though it may have originated on the water. This springs from the well-known principle that there are two essential ingredients to a cause of action, viz., a wrong, and damage resulting from that wrong. Both must concur. To constitute a maritime cause of action, therefore, not only the wrong must originate on water, but the damage—the other necessary ingredient—must also happen on water. The injury in the instant case happened on the land. Docks and wharves are but improvements or extensions of the shore. They are fixed and immovable, and are a mere continuation and part of the real estate to which they are attached, and this is the case whether they project over the water or not. Under the facts of this case and the decisions above referred to, we must hold that the circuit court had jurisdiction.

2. It is the claim of the plaintiff in this court, as it was in the court below, that the master or pilot was inefficient and incompetent; also that he was guilty of negligence in not keeping his boat away from the shore and pier; and, lastly, in shutting off the power and permitting the boat to drift against the pier, and in abandoning the boat and putting the plaintiff in a perilous position, which necessitated his jumping from the boat in order to escape the danger of being left in the deserted boat alone.

We think the circuit judge properly submitted to the jury the question of the claimed negligence of the defendants. It was a fair question for the jury whether this was an error in judgment of a competent man, or whether it was an act of negligence on his part. The distinction between an error of judgment, in case of an emergency, of a competent man, and negligence is clearly pointed out in the case of *Luka* v. *Lowrie,* 171 Mich. 122 (136 N. W. 1106, 41 L. R. A. [N. S.]

290). As was there said (quoting from *The Tom Lysle* [D. C.], 48 Fed. 690) :

"The distinction between an error in judgment and negligence is not easily determined. It would seem, however, that if one, assuming a responsibility as an expert, possesses knowledge of the facts and circumstances connected with the duty he is about to perform, and, bringing to bear all his professional experience and skill, weighs those facts and circumstances, and decides upon a course of action which he faithfully attempts to carry out, then want of success, if due to such course of action, would be due to error of judgment, and not to negligence. But if he omits to inform himself as to the facts and circumstances or does not possess the knowledge, experience, or skill which he professes, then a failure, if caused thereby, would be negligence."

There was no evidence that defendants had knowledge or notice of Porter's claimed incompetency, or of anything that was sufficient to put them upon inquiry, or of any conduct that would have disqualified him for the work he was doing. The court did not err in taking that question from the jury. We think, however, that the question of the claimed negligence of the master in the particulars named was properly submitted to the jury by the trial court.

An examination of the record satisfies us that there was no reversible error therein, and the judgment of the court below is therefore affirmed.

BIRD, MOORE, STEERE, and PERSON, JJ., concurred with STONE, C. J.

BROOKE, J. (*dissenting*). The record in this case discloses that the distance between Pottawattamie Beach and St. Joe Harbor is 8 miles. The boat in which plaintiff was being transported was capable of covering the distance in about one hour. When approximately 5 miles of the distance had been covered,

a sudden squall, accompanied by a heavy rain, developed. It is uncontradicted that the heavy precipitation, accompanied by a clouding of the sun, rendered it impossible for the occupants of the boat to see more than a very few feet ahead of them. The velocity of the wind for a period of ten minutes was between 40 and 50 miles per hour. According to the testimony, not more than ten minutes elapsed between the indications that a squall was coming and its actual breaking. The record further discloses that a line of pound nets was set along the shore between Pottawattamie Beach and St. Joe Harbor at a distance of about 1,000 feet from the shore, and extending out into the lake a like distance. In fair weather it was customary for boats, the size of the one in use on this occasion, to navigate between the shore and the pound nets. In rough or stormy weather they usually proceeded outside said line of nets. There being no indication of bad weather when the trip under consideration was undertaken, the inside passage was chosen. When the storm broke, Porter, the master of the ship, continued on his way, accelerating the speed of his engine to its limit, which was about 9 miles per hour. The wind which came from the northwest had a tendency to drift the boat somewhat toward the shore. The exact amount of the drift it was impossible to determine by reason of the fact that the storm had entirely obscured the shore and all lights.

The Edgewater pier extends out into the lake for a considerable distance near the point where the boat was when the squall struck her. As the master was proceeding to propel his boat in what he believed to be the proper direction, the lights on the Edgewater pier suddenly appeared almost directly in front of him and but a comparatively few feet distant. Both he and the plaintiff agreed that he immediately attempted to turn his boat to the right towards the lake, but was

unable to escape contact with the pier. Porter claims that this contact was due to the fact that his engine "died" upon him, probably because in the storm water had interfered with the proper operation of its mechanism. The plaintiff claims that *after* the boat struck the pier the master tried to clear her, but, being unable to do so, he shut off the engine. In my opinion it is immaterial which narrative accords with the fact. Having struck the pier and being unable to disengage his boat therefrom, Porter climbed out upon the pier and instructed the plaintiff to follow. This the plaintiff did, and was assisted by Porter from the boat to the pier.

The only witness produced by plaintiff to prove negligence on the part of the defendant was the plaintiff himself. On cross-examination he was interrogated as follows:

"*Q.* What did this man do on that boat that, in your judgment, he had not ought to have done?

"*A.* I do not think he should; he should have deserted his launch at the time.

"*Q.* Well, what else; now, you were there?

"*A.* That would take in the whole question, I believe, when you ask me, What should not he have done? that he deserted his launch. He deserted his launch, and practically left me there at—on the pier, because after I had got up on the pier, and had a hold of the fence, he started running on down the pier.

"*Q.* He lifted you up on the pier?

"*A.* He assisted me on the pier on this side of the fence on the side of the lake; he was on the other side of the fence.

"*Q.* You got across the fence in some way?

"*A.* I got across the fence in some way.

"*Q.* Were you hurt in getting across the fence?

"*A.* No; I was not hurt in getting across the fence; I was hurt before I got across.

"*Q.* Tell us something in your judgment that indicated that he did that he had not ought to have done; that you consider negligence?

"*A.* I consider when we were tossed around in the lake, not knowing where he was at, that it should have been in his place—if he had a compass there he could have turned his boat around and run into towards the shore. I can't say that he is negligent in that part in a way. If he had a compass there, why he probably would have known his way to go. * * * He made his turn too short and caught the pier.

"*Q.* Made what turn too short?

"*A.* Coming out from around here where I showed you before, where we crossed—where the canopy caught the end of the pier. That was negligence on his part. Had he guided his boat right, he would have missed the pier. * * *

"*Q.* The fact of the matter is, you didn't see the pier at all until the boat was striking right on the pier. That is true?

"*A.* No, sir; he was shoving the boat from the pier before we struck it.

"*Q.* After he got up close to the pier he endeavored to save the boat?

"*A.* Yes, sir.

"*Q.* How close to the pier were you before you saw it?

"*A.* We were almost on top of it."

I am clearly of the opinion that the situation as disclosed by the uncontradicted evidence was one of emergency, where the master of the ship, confronted by one of the perils of navigation, with full knowledge of such facts as could be obtained under the circumstances, exercised his best judgment in the extremity which presented itself, and this is true whether we accept the master's story that the engine "died" upon him or the plaintiff's story that he shut off the power after the boat had struck.

It is not apparent to me that the master was guilty even of an error of judgment in his conduct after the lights suddenly appeared in front of him. The predicament in which he then found himself was due to an error in judgment as to the direction in which he

was steering, caused by the sudden darkness which completely obscured his surroundings.

To the quotation from *The Tom Lysle* (D. C.), 48 Fed. 690, which my Brother STONE presents in his opinion, should be added:

"No one can be charged with carelessness, when he does that which his judgment approves, or where he omits to do that of which he has no time to judge. Such act or omission, if faulty, may be called a mistake, but not carelessness" (citing *Brown* v. *French,* 104 Pa. 604; *Williams* v. *Le Bar,* 141 Pa. 149 [21 Atl. 525]).

"It is the elementary principle that when a man acts according to his best judgment in an emergency,    *    *    *    he is not chargeable with negligence" (citing *Staloch* v. *Holm,* 100 Minn. 276 [111 N. W. 264, 9 L. R. A. (N. S.) 712])

—but I am unable to glean from this record that defendants' agent, Porter, when confronted with this emergency, which was not of his own making, acted even injudiciously.

I am of opinion that the judgment should be reversed without a new trial.

OSTRANDER and KUHN, JJ., concurred with BROOKE, J.